UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

THE GEOFFREY A. ORLEY REVOCABLE
TRUST U/A/D 1/26/2000 *and* THE RANDALL C.
ORLEY REVOCABLE TRUST U/A/D
03/16/1994,

                  Plaintiffs,

– against –

NICHOLAS GENOVESE; WILLOW CREEK
ADVISORS, LLC; WILLOW CREEK
INVESTMENTS, LP; AIMEE L. RICHTER,
ESQ.; LEE ANAV CHUNG WHITE KIM RUGER
& RICHTER LLP; SALVATORE SCIBETTA,
ESQ.; *and* BENDER & ROSENTHAL LLP *as
successor-in-interest to Bender Rosenthal & Richter
LLP*,

                  Defendants.

**<u>OPINION & ORDER</u>**

18 Civ. 8460 (ER)

<u>RAMOS, D.J.</u>:

      Two trusts, one chaired by Geoffrey Orley and the other chaired by his brother,

Randall, claim that Nicholas Genovese, as well as attorneys Salvatore Scibetta and Aimee

Richter, defrauded or acted negligently towards the trusts under the federal securities

laws and New York common law. The trusts also allege that the lawyers entered into a

conspiracy with Genovese, aided and abetted him in his fraudulent conduct, or both.[1]

Scibetta and Richter — along with their current and former firms, Lee Anav Chung White

Kim Ruger & Richter LLP ("Lee Anav") and Bender & Rosenthal LLP respectively[2] —

---

[1] This Court has subject matter jurisdiction under 28 U.S.C. § 1332 because the trusts are both created
under the laws of Michigan, the defendants are domiciled outside of Michigan, and the amount in
controversy exceeds $75,000. First Am. Compl. ¶¶ 21, 23, 34, 30, 31, 34, 36.

[2] Scibetta and Richter were partners at defendant Bender & Rosenthal LLP (then Bender, Rosenthal &
Richter LLP) before December 2015. First Am. Compl. ¶¶ 32, 35, Doc. 28. After leaving Bender &
Rosenthal in or about December 2015 or January 2016, Scibetta and Richter became partners at Lee Anav

move to dismiss the Amended Complaint in its entirety.[3]  Those motions are GRANTED in their entirety, although the trusts are granted leave to replead several of the counts as described below.

## I.    THE AMENDED COMPLAINT'S ALLEGATIONS

The Amended Complaint concerns the investments made in November 2015 and January 2016 by the George Orley Trust, chaired by George Orley, and the Randall Orley Trust, chaired by Randall Orley.  It discusses three separate phases of the alleged fraud: inducing the trusts to make an initial investment, dissuading the trusts from redeeming the investment, and the discovery by the trusts of the alleged fraud.

### A.    The Trusts' Initial Investments

A mutual friend—unnamed in the Amended Complaint—introduced Geoffrey Orley and Genovese in September or October 2015.  First Am. Compl. ("FAC") ¶ 38, Doc. 28.  Geoffrey later introduced Genovese to his brother, Randall.  *Id.* ¶ 51–52.  When Geoffrey and Genovese first met, Genovese explained that he was a member of the Genovese family, which had profitably sold a chain of drugs stores in New York for $300 million.  *Id.*  He also boasted that he had graduated from the Tuck School of Business at Dartmouth, was a director at Bear Sterns before its collapse, had been a partner at Goldman Sachs, and had achieved great success in running his own investment fund, Willow Creek.  *Id.* ¶¶ 39–41.  In particular, he said that the Willow Creek fund was worth between $25 billion and $30 billion and enjoyed returns of 30 to 40 percent each year.  *Id.* ¶ 42.  The largest investor in Willow Creek, Genovese claimed, was his mother, the heiress to the Genovese drug store fortune.  *Id.* ¶ 43.  During this meeting, Genovese referred to a January 2015 brochure, which the trusts claim was prepared with assistance

---

Chung White Kim Ruger & Richter LLP.  *Id.*  Neither firm contests for the purposes of this motion that they are responsible for Scibetta and Richter's conduct during the firms' employment of the lawyers under the principles of agency and *respondeat superior*.

[3] The defendants submit three motions to dismiss:  one by Scibetta, one by Richter and Lee Anav, and one by Bender & Rosenthal.  Genovese and his investment firms, Willow Creek Advisors, LLC and Willow Creek Investments, LP, have not appeared in this case.

from Scibetta, then outside general counsel and a partner at Bender & Rosenthal.  FAC ¶¶ 45, 49.  The brochure indicated that Willow Creek had operated for seven years and had been profitable in each of them.  *Id.* ¶¶ 45–46.  It also repeated much of Genovese's background.  *Id.* ¶ 47.

Very little of what Genovese said about himself and his funds was true.  According to the trusts, Genovese had never been a director at Bear Sterns or a partner at Goldman Sachs.  FAC ¶ 130.  He had never attended Tuck, and he was not a scion of the Genovese drug store empire as he claimed.  *Id.*  In fact, Genovese had been arrested and pled guilty at least five times for crimes that included theft by deception, attempted grand larceny, grand larceny, identity theft, forgery, and scheming to defraud; he had spent at least seven years in prison on these charges.  *Id.* ¶ 131.  And Willow Creek, allege the trusts, never had anywhere near the amount of assets, number of investors, rate of return, or level of operational activity that Genovese claimed.  *Id.* ¶¶ 45, 53, 130.  The trusts further allege that Scibetta advised Genovese to only include "positive, albeit false and misleading numbers" in the brochure, and they allege that Scibetta knew that the figures contained in the brochure were false.  *Id.* ¶¶ 49–50.  Not knowing that any of these representations were false at the time, both trusts agreed to invest.

Prior to finalizing the investment, Genovese provided a document regarding the Personal Security & Privacy Information of Willow Creek to the trusts.  FAC ¶ 55.  Based on the fact that the document contained "technical language and terms of art," the trusts allege that Scibetta assisted in the preparation of the document.  *Id.* ¶ 56.  The Privacy Information document indicated that Willow Creek was a member of the Securities Investor Protection Corporation.  *Id.*  The SIPC is an insurance program that protects customers if the SIPC member brokerage firm were to fail.  *Id.* ¶ 57.  But Willow Creek was not a member of the SIPC; the Privacy Information document was false in this regard.  *Id.* ¶ 60.  The trusts allege that Scibetta encouraged Genovese to include the SIPC designation in the document and that Scibetta recklessly failed to check or consciously

avoided discovering whether Willow Creek was indeed a member of SIPC before making his recommendation. *Id.* ¶ 61.

Based on Genovese's representations, and those made in the brochure, the trusts each invested $1 million — $2 million in total — in November 2015. FAC ¶ 64. At the end of 2015, the trusts received account statements indicating that their accounts had appreciated by five percent in their first month. *Id.* ¶ 65. They received a K-1 tax form that reflected the same information. *Id.* ¶ 67. But neither document was true; the trusts allege that their funds were never actually invested as reflected. *Id.* ¶ 65. Excited by these impressive (but allegedly false) returns, the trusts doubled their investments in January 2016, increasing them to $2 million each — $4 million in total. *Id.* ¶ 66.

The trusts allege that, during this time, Genovese had arranged to pay a $20,000 finder's fee to an unnamed third-party when the trusts made their initial investment and another $20,000 to the same party if the trusts' funds remained with Willow Creek for over a year. FAC ¶ 77. The trusts allege, "[p]er Genovese, and upon information and belief, Scibetta was to share in the finder's fees . . . ." *Id.* The trusts label this arrangement a "kickback" scheme. *Id.*

Approximately one month after the second investment, in February 2016, Randall Orley and his accountant met with Scibetta and Genovese at Willow Creek's new headquarters in New York City. FAC ¶ 86. This was the first time either Orley had met Scibetta. At the time of this meeting, Scibetta had moved to Lee Anav, but remained Willow Creek's outside general counsel. *Id.* ¶ 79, 81. At the meeting, Scibetta suggested that he and Genovese "had a long and successful business relationship." *Id.* ¶ 86. The trusts allege that Scibetta knew of Genovese's criminal convictions at that time and had suggested that Genovese tell no one about them. *Id.* ¶ 87.

The trusts also allege that Scibetta, knowing the truth, "listened to and affirmed" Genovese as he repeated the false story of the Genovese drug store fortune and his family's investments in Willow Creek. FAC ¶ 88–89. During the meeting, Scibetta

stated that the trusts were small compared to other investors in Willow Creek, although he declined to name them, citing confidentiality restrictions.  *Id.* ¶ 90.  The trusts allege that Scibetta knew or should have known that Genovese's family was not involved in Willow Creek, that there were few other investors in Willow Creek and that the trusts were not small in relation to whatever other clients of Willow Creek existed.  *Id.*

The trusts claim that Genovese and Scibetta hid the non-existence of trading operations at Willow Creek, as well.  At that February meeting, Randall Orley asked Genovese why there were no traders at Willow Creek's headquarters.  FAC ¶ 92. Genovese said that they were being moved from Willow Creek's old location.  *Id.*  Orley asked for more detail about trading operations, but Scibetta demurred, claiming the information was confidential.  *Id.* ¶ 93.  The trusts claim that Scibetta's statements were false because Scibetta knew or should have known that Willow Creek, in fact, had no trading operations.  *Id.*  Indeed, based on Scibetta's alleged involvement in and knowledge of Willow Creek, the trusts allege that Scibetta knew or should have known that Genovese had never actually invested the trusts' funds, instead using them for his own personal benefit.  *Id.* ¶ 94.

### B.  The Redemption Request

In March 2016, both trusts requested that Willow Creek return $1 million, each — half of the $4 million total investment.  FAC ¶ 97.  Willow Creek replied that they could not redeem the funds until they had been invested with Willow Creek for six months, that is, after May 2016.  *Id.*  This representation was consistent with what was indicated in the January 2015 brochure.  *Id.* ¶ 46.

A month later, in April, the trusts received a Private Placement Memorandum ("PPM") for Willow Creek Investments, of which Willow Creek GP was listed as general partner and Willow Creek Advisors as investment manager.  FAC ¶ 98.  The PPM described Genovese's background at Goldman Sachs and Bear Stearns and indicated that the firm Grant Thornton was Willow Creek's accountant.  *Id.*  The trusts allege that this

background was untrue, and that Grant Thornton was never an accountant for Willow Creek. *Id.*

In May, with the redemption pending, Geoffrey Orley met with Scibetta and Genovese in New York City. FAC ¶ 101. Genovese told Orley that the fund was doing well and continued to boast about his background. *Id.* ¶ 102. Scibetta indicated that he had been with Willow Creek for a long time, and he promised that an audit of Willow Creek would be completed and produced. *Id.* ¶ 103. According to the trusts, however, no audit was planned. *Id.* ¶ 104. Scibetta also indicated that the trusts were invested in the least risky fund available and that the traders were located nearby, although he indicated that their offices were not open for tours. *Id.* ¶ 106. He demurred when asked about the details of Willow Creek's operations, citing confidentiality restrictions. *Id.* ¶ 106. Based on this meeting Geoffrey Orley reduced his redemption request to $500,000 from $1 million; Randall Orley did not decrease his redemption request. *Id.* ¶ 108.

In July 2016, Willow Creek informed both trusts that their redemption requests had been flagged by Willow Creek's compliance department as potentially fraudulent under the SEC's anti-money-laundering regulations. FAC ¶ 113. According to an email from the compliance department, the trusts had to either reduce their redemption requests or close their accounts entirely. *Id.* The Orleys, the trusts' corporate counsel, Genovese, and Richter — the other lawyer-defendant from Lee Arnav that had, at that time, just replaced Scibetta as outside general counsel of Willow Creek — spoke via conference call later that week. *Id.* ¶ 114. Richter stated that the SEC's rules prevented the trusts from withdrawing money for one year. *Id.* The trusts allege that this statement was untrue, and they allege that Richter knew or should have known the statement was untrue. *Id.* Based on this statement, the trusts withdrew the entirety of their redemption requests. *Id.* ¶ 118.

The trusts renewed their redemption requests in September 2016, asking that the funds be returned at the end of the year, per Richter's advice. *Id.* ¶ 119. Genovese

attempted to convince Geoffrey Orley to withdraw his trusts' redemption request in December 2016 by planning a trip with him and assuring him that the unnamed mutual friend that introduced the two could join Willow Creek's board. *Id.* ¶ 120. Geoffrey withdrew his trust's request that month. Randall Orley's trust, however, maintained its redemption request and received its $1 million (or half of its total investment) from Willow Creek in April 2017. *Id.* ¶ 124.

In early 2017, the trusts received another set of K-1s that detailed their accounts' performance. FAC ¶ 121. These forms indicated that the trusts' accounts had grown by almost 30 percent in 2016. *Id.* Also in early 2017, the trusts allege that Richter called the unnamed mutual friend of Geoffrey Orley and Genovese and told the friend that only members of the Genovese family could join the board, a statement that the trusts allege was false. *Id.* ¶ 123.

### C. The Discovery of the Fraud

After Randall Orley's trust had received its redemption, the unnamed mutual friend of Geoffrey Orley and Genovese called Geoffrey and told him that Genovese had a criminal history. FAC ¶ 125. Genovese denied these allegations. *Id.* Nevertheless, in May 2017 both Randall and Geoffrey Orley requested that all remaining funds, including any investment gains, be returned to them. *Id.* ¶ 126.

According to the trusts' Amended Complaint, Genovese stalled for the rest of the year. He first claimed there was a notice period that prevented immediate liquidation. FAC ¶ 128. Then he claimed that the positions were too complex to liquidate quickly. *Id.* But the trusts allege that, during this time, there were no funds to liquidate at all; Genovese had exhausted the trusts' money with his personal investments and spending. *Id.* ¶ 129. Although the trusts have since learned of Genovese's alleged misappropriation of their funds, the trusts never received the outstanding $3 million. *Id.* ¶ 14.

In early 2018, Genovese was sued by another Willow Creek investor for fraud, *Colony Hills Capital, LLC v. Willow Creek Advisors*, No. 18 Civ. 593 (DAB) (S.D.N.Y.),

and by the Securities and Exchange Commission for violations of federal securities laws, *SEC v. Genovese*, No. 18 Civ. 942 (JGK) (S.D.N.Y.).  Additionally, Genovese pleaded guilty to one count of criminal securities fraud in the Southern District of New York in October 2018 for his actions related to Willow Creek and is incarcerated pending his sentence.  *United States v. Genovese*, No. 18 Crim. 183 (WHP) (S.D.N.Y.).

## II.    LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (citing *Twombly*, 550 U.S. at 556).  The plaintiff must allege sufficient facts to show "more than a sheer possibility that a defendant has acted unlawfully."  *Id.* (citing *Twombly*, 550 U.S. at 557).  However, this "flexible 'plausibility standard'" is not a heightened pleading standard, *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 n.3 (2d Cir. 2007) (citation omitted), and "a complaint . . . does not need detailed factual allegations" to survive a motion to dismiss.  *Twombly*, 550 U.S. at 555.

The question on a motion to dismiss "is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims."  *Sikhs for Justice v. Nath*, 893 F. Supp. 2d 598, 615 (S.D.N.Y. 2012) (quoting *Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 378 (2d Cir. 1995)).  "[T]he purpose of Federal Rule of Civil Procedure 12(b)(6) is to test, in a streamlined fashion, the formal sufficiency of the plaintiff's statement of a claim for relief without resolving a contest regarding its substantive merits" or "weigh[ing] the evidence that might be offered to support it."  *Halebian v. Berv*, 644 F.3d 122, 130 (2d Cir. 2011) (internal citations and quotation marks omitted).

Accordingly, when ruling on a motion to dismiss pursuant to Rule 12(b)(6), the Court accepts all factual allegations in the complaint as true and draws all reasonable inferences in the plaintiff's favor. *Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014); *see also Twombly*, 550 U.S. at 556 ("[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable. . . ."). "For purposes of this rule, the complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002) (internal quotation marks omitted).[4]

\* \* \*

In their Amended Complaint, the trusts make three sets of allegations against Scibetta, Richter, and their firms. They first argue that these defendants violated SEC Rule 10b-5 and committed fraud under New York common law. Then the trusts argue that, if these defendants did not violate Rule 10b-5 or commit fraud, that they were at least negligent in their interactions with the trusts. Finally, the trusts argue that, if these defendants are not *primarily* liable for the trusts' losses, they are *secondarily* liable via a civil conspiracy with Genovese or via the substantial aid Scibetta and Richter gave to Genovese as he carried out his fraudulent scheme. The Court finds that none of these theories of liability survive.

---

[4] The defendants urge the Court to consider a set of four emails between Genovese and Scibetta in its consideration of their motions to dismiss. Doc. 54. That request is DENIED. They argue that these documents are incorporated into the first Amended Complaint by reference and thus properly considered by this Court because the trusts have "artfully concealed" the emails' existence in their pleading — emails that "flatly contradict[] the allegations in the [C]omplaint." Doc. 68 at 5 (quoting *Tulczynska v. Queens Hosp. Ctr.*, No. 17 Civ. 1669 (DAB), 2019 WL 6330473, at *5 (S.D.N.Y. Feb. 12, 2019)). The Court finds that the emails are in no way incorporated by reference in the trusts' Amended Complaint because no agent of the trusts was copied on the emails and the Amended Complaint (the allegations within which the Court must take as true) provides no indication that the trusts were aware of the emails at all. The emails will not be considered in the Court's analysis of this motion.

### III.    FRAUD UNDER FEDERAL SECURITIES LAW
###          AND NEW YORK COMMON LAW

Section 10(b) of the Securities Exchange Act of 1934 prohibits using or employing, "in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance," 15 U.S.C. § 78j(b), while SEC Rule 10b-5, promulgated thereunder, creates liability for a person who makes "any untrue statement of a material fact or . . . omit[s] to state a material fact . . . in connection with the purchase or sale of any security." *In re OSG Sec. Litig.*, 971 F. Supp. 2d 387, 397 (S.D.N.Y. 2013) (quoting 17 C.F.R. § 240.10b-5).  Rule 10b-5 "more specifically delineates what constitutes a manipulative or deceptive device or contrivance." *Press v. Chemical Inv. Servs. Corp.*, 166 F.3d 529, 534 (2d Cir. 1999).  Under Rule 10b-5, it is unlawful for any person, directly or indirectly, by the use of any means specified in Section 10(b):

> (a) To employ any device, scheme, or artifice to defraud,

> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

To state a private civil claim under Section 10(b) and Rule 10b-5, a plaintiff must plead that:  (1) the defendant made a material misrepresentation or omission, (2) with scienter, that is, a wrongful state of mind, (3) in connection with the purchase or sale of a security, and (4) that the plaintiff relied on the misrepresentation or omission, thereby (5) causing economic loss.  *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341–42 (2005); *see also Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147, 153 (2d Cir. 2007).

In New York, a claim of common law fraudulent misrepresentation has five elements: "(1) a material misrepresentation or omission of fact (2) made by defendant with knowledge of its falsity (3) and intent to defraud; (4) reasonable reliance on the part of the plaintiff; and (5) resulting damage to the plaintiff." *Crigger v. Fahnestock and Co., Inc.*, 443 F.3d 230, 234 (2d Cir. 2006). These elements are analyzed in essentially the same manner as a claim alleging violation of Rule 10b-5. *See, e.g.*, *Alpha Capital Anstalt v. Schwell Wimpfheimer & Associates LLP*, No. 17 Civ. 1235 (GHW), 2018 WL 1627266, at *21 (S.D.N.Y. Mar. 30, 2018).

A complaint alleging securities fraud must also satisfy the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA") by stating the circumstances constituting fraud with particularity. *See, e.g.*, *ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009) (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319–20 (2007)). These requirements apply whenever a plaintiff alleges fraudulent conduct, regardless of whether fraudulent intent is an element of a claim. *Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir. 2004) ("By its terms, Rule 9(b) applies to 'all averments of fraud.'")

Specifically, Rule 9(b) requires that a securities fraud claim based on misstatements must identify: (1) the allegedly fraudulent statements, (2) the speaker, (3) where and when the statements were made, and (4) why the statements were fraudulent. *See, e.g.*, *Anschutz Corp. v. Merrill Lynch & Co., Inc.*, 690 F.3d 98, 108 (2d Cir. 2012). Conditions of a person's mind — such as malice, intent, or knowledge — may be alleged generally. *Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir. 2001) (quoting Fed. R. Civ. P. 9(b)). Like Rule 9(b), the PSLRA requires that securities fraud complaints "'specify' each misleading statement," set forth the reasons or factual basis for the plaintiff's belief that the statement is misleading, and "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Dura*, 544 U.S. at

345  (quoting 15 U.S.C. §§ 78u–4(b)(1), (2)); *see also Slayton v. Am. Express, Co.*, 604

F.3d 758, 766 (2d Cir. 2010).

These heightened pleading standards, when viewed together with the more general

standards applicable to Rule 12(b)(6) motions to dismiss under *Twombly* and *Iqbal*, make

clear that "plaintiffs must provide sufficient particularity in their allegations to support a

plausible inference that it is more likely than not that a securities law violation has been

committed."  *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 570 (S.D.N.Y. 2014), *aff'd*

604 F. App'x 62 (2d Cir. 2015) (citing *ECA, Local 134*, 553 F.3d at 196).

\* \* \*

The trusts' allegations of misstatements or omissions fall into three main

categories:  the documentation provided to the trusts before their investments, allegedly

prepared in part by Scibetta; the statements by Scibetta in the February and May 2016

meetings as the trusts pursued their initial redemption requests; and the statements by

Richter regarding the need to delay redemption for another six months due to anti-

money-laundering regulations and regarding the requirement that only family of

Genovese was allowed to be on Willow Creek's board.

## A.  The Documents Prepared by Scibetta

Scibetta first argues that he cannot be held liable under Rule 10b-5 for statements

made in either the January 2015 brochure Genovese used to pitch Willow Creek to the

trusts or the document regarding the Personal Security & Privacy Information of Willow

Creek, which the trusts reviewed before their initial investment.[5]  For support, he points

to the Supreme Court opinion in *Janus Capital Group, Inc. v. First Derivative Traders*,

564 U.S. 135 (2011).  In that opinion, the Court limited liability under Rule 10b-5 for

misstatements to those who have "ultimate authority over the statement, including its

content and whether and how to communicate it."  *Id.* at 142.  Because, Scibetta argues,

---

[5] Bender & Rosenthal, at which Scibetta was a partner when he allegedly prepared these documents, makes this argument, as well.

Scibetta merely "prepare[d] or publish[ed] a statement on behalf of" Genovese, he cannot be held liable. *Id.*

The Court agrees with this assessment of the allegations. Scibetta is never alleged to have disseminated or approved any of the language contained in either document; he is only alleged to have advised Genovese during the creation of the documents or to have provided certain language. Scibetta's alleged behavior is similar to the behavior of one of the defendants in *Janus*, where a mutual fund advisory firm was not held liable for false statements in a mutual fund's prospectuses. 564 U.S. at 147–48. Even though the firm had been "significantly involved in preparing the prospectuses," it was not held to have "made" the statements in question. *Id.* So too here. Scibetta was only the non-liable "speechwriter" of the statement Genovese ultimately made. *See id.* at 143; *see also Alpha Capital Anstalt v. Swchwell*, No. 17 Civ. 1235 (GHW), 2018 WL 1627266, at *10 (S.D.N.Y. Mar. 30, 2018) (holding that lawyer who drafted false 8-K filing was not a maker of the false statement).

In response, the trusts point to *Lorenzo v. SEC*, 139 S. Ct. 1094, 1103–04 (2019), which, they contend, limits the holding of *Janus* to a single paragraph of Rule 10b-5, paragraph (b).[6] *Lorenzo*, the trusts argue, allows a preparer of a statement to be held liable if his actions constituted a "device, scheme, or artifice to defraud" under paragraph (a) or an "act, practice, or course of business which operate[d] or would [have] operat[ed]

---

[6] Rule 10b-5 states in full:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

> (a) To employ any device, scheme, or artifice to defraud,

> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 CFR § 240.10b-5.

as a fraud or deceit" under paragraph (c), even if he is not a "maker" of a statement and thus liable under paragraph (b). In essence, the trusts argue that Scibetta's participation in the preparation of the documents gives rise to primary liability under Rule 10b-5 for their loss because such participation was one part of a larger scheme to defraud them.

But *Lorenzo*'s facts are different from those of this case. In *Lorenzo*, an investment banker forwarded false language written by his superior to investors. 139 S. Ct. at 1099. The Court held that, even though he had not "made" the underlying language, he could nevertheless be held liable through a private suit brought under paragraphs (a) and (c) of Rule 10b-5 because he disseminated the language with the intent to defraud. *Id.* at 1101. Here, however, Scibetta is not alleged to have disseminated the statements in the January 2015 brochure or the Privacy Information document to anyone, least of all the trusts. Therefore, the trusts may not take advantage of any additional liability *Lorenzo* may have carved out of *Janus*. *See id.* at 1103 ("[W]e can assume that *Janus* would remain relevant (and preclude liability) where an individual neither *makes* nor *disseminates* false information . . . .").

Furthermore, construing Scibetta's actions here to fall under the prohibitions of paragraphs (a) and (c) would serve to erase the distinction between primary liability, which may be punished through private suits under 10b-5, and secondary liability, which may not. That distinction was discussed in *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148, 160 (2008). In that case, plaintiffs sought to hold Scientific-Atlanta, Inc., a cable-box provider, responsible for misstatements made by one of its customers, Charter Communications, Inc., by arguing that the entrance of the cable-box provider into fraudulent business deals with Charter was part of a larger scheme that eventually violated Rule 10b-5. *Id.* at 153–54. The Court declined to hold Scientific-Atlanta liable under this "scheme liability" theory, holding that the plaintiff could not plead reliance using those allegations alone. *See id.* at 161. Accordingly, such schemes alone could give rise only to secondary liability that may only be pursued by the SEC.

*Id.*  The allegations regarding Scibetta's participation in the drafting of the documents at issue here likewise fail to plead reliance and therefore must be dismissed.

### B.  The Meetings Involving Scibetta

 The trusts also attempt to plead liability under Rule 10b-5 and state common law fraud against Scibetta for allegedly lying to them in February 2016 when he discussed his long business relationship with Genovese, failed to disclose Genovese's criminal history, affirmed Genovese's retelling of his allegedly fraudulent backstory, and discussed the number and relative size of other Willow Creek clients, as well as the existence of Genovese family investors.  They do the same for Scibetta's statements in May 2016, alleging he lied to them when he told the trusts that he had been with the firm for a long time, that an audit would be produced, that the trusts were invested in a low-risk fund, and that there were traders located nearby. [7]  Although the trusts have properly pleaded Scibetta's intention to defraud the trusts through the use of these sufficiently particular false statements, [8] they fail to plead that these statements directly harmed the trusts in any way.

Scienter is adequately pleaded when a complaint "alleges facts showing either: (1) a motive and opportunity to commit the fraud; or (2) strong circumstantial evidence of conscious misbehavior or recklessness."  *Emps.' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*, 794 F.3d 297, 306 (2d Cir. 2015) (internal quotations and citation omitted).  Circumstantial evidence points to scienter when defendants, among other things

---

[7] The trusts also allege that Scibetta's deflection of questions concerning Willow Creek's trading operations because the information was "confidential" were omissions or misstatements.  The Court does not agree.  As alleged, Scibetta's invocation of confidentiality operated as a refusal to answer the question, rather than a confirmation or denial of the existence of trading operations.

[8] All of the moving defendants argue that the trusts' apparent sophistication makes it unreasonable for them to have relied upon Scibetta's or Richter's statements.  But, on a motion to dismiss, the Court must take all allegations as true and draw all inferences in favor of the non-moving party, that is, the trusts.  On that standard, they have sufficiently plead reliance.

"benefitted in a concrete and personal way from the purported fraud." *Id.* (internal quotations and citation omitted).

The trusts adequately plead such evidence here. They allege, "[p]er Genovese,[9] and upon information and belief," that Scibetta stood to benefit from part of a finder's fee (or what the trusts call "kickbacks") if the trusts maintained their funds in Willow Creek for a term of at least one year. [10] *See* FAC ¶ 77. As alleged, Scibetta had motive to convince the trusts that their money was in good hands and to dissuade them from redeeming their investments in that first twelve months because he stood to gain money if they remained. This benefit is sufficient to permit an inference of scienter for the purposes of a motion to dismiss.

But a lie standing alone, even one intended to defraud, does not give rise to liability. It must have actually caused harm, something the trusts did not allege happened here. In securities fraud cases, causation includes two elements: "transaction causation" — the link between a misstatement or omission and the plaintiff's decision regarding the transaction at issue — and "loss causation" — the connection between the defendant's alleged conduct and the loss suffered by the plaintiff. *See Emergent Capital Inv. Mgt., LLC v. Stonepath Grp., Inc.*, 343 F.3d 189, 197 (2d Cir. 2003). The Second Circuit has analogized these ideas to the tort concepts of "direct cause" and "proximate cause," respectively. *Id.*

---

[9] In the Amended Complaint, the trusts indicate that a number of their allegations are "per Genovese." In their opposition to Bender's motion, they indicate this information comes through Genovese's attorney. *See* Doc. 57 at 11 n.11 ("Plaintiffs did not have Mr. Genovese's cooperation; rather a few facts were provided through Genovese's attorney."). The parties do not indicate whether this attorney was retained for the purposes of this case, the parallel case brought by another Willow Creek Investor, the SEC case, or the pending criminal case in this District.

[10]  Contrary to the defendants' arguments, alleging that this background information comes from Genovese is sufficient to support their allegations of scienter. The authority cited in opposition, *e.g.*, *Eurycleia Partners, LP v. Seward & Kissel, LLP*, 910 N.E.2d 976, 980 (N.Y. 2009); *Doscher v. Sobel & Co., LLC*, No. 14 Civ. 646 (RMB), 2015 WL 774695, at *5 (Feb. 11, 2015 S.D.N.Y.), only includes allegations made on "information and belief" without *any* supporting source. They are inapplicable to the current case.

As alleged in the Amended Complaint, Scibetta's behavior in the two meetings only occurred *after* the trusts had entrusted their funds to Willow Creek. Although the trusts argue that this behavior led them to delay their efforts to redeem their funds, the only conclusion the Court can draw from the Amended Complaint is that there was no money in Willow Creek to redeem. Indeed, according to the Amended Complaint, Willow Creek was not an investment fund at all; it was a vehicle for Genovese to fund his lifestyle and personal investments. Indeed, the trusts specifically allege that Willow Creek had "no trading operations," FAC ¶ 93, that "Genovese had not invested for the accounts set up by" the trusts, FAC ¶ 94, and that "there are no funds in [Willow Creek] to redeem the [trusts'] investments," FAC ¶ 129. By the time Scibetta allegedly made the fraudulent statements, the proverbial cows had already left the barn. Although Scibetta's efforts may have delayed the discovery of the fraud, his efforts, as alleged, did not increase the damages suffered by the trusts.

### C. The Meetings Involving Richter

The meetings involving Richter suffer from the same flaw as those involving Scibetta. All of the communications occurred after the initial investments and therefore, without more facts, could not have damaged the plaintiffs.

Furthermore, scienter is not sufficiently pleaded as to Richter. Unlike Scibetta, Richter is not alleged to have been granted special benefits for inducing the trusts' investments or keeping them in the fund for a certain period of time. The trusts attempt to create such a specified allegation by arguing Richter would have received additional attorneys' fees for her work. That argument is unpersuasive for two reasons: legal fees are never mentioned in the Amended Complaint, and even if they were, there is not even a hint that Richter's retainer was in any way conditioned on the actions of the Willow Creek funds *vis-à-vis* the trusts.

* * *

Accordingly, the First Count, alleging violations of Section 10(b) of the Exchange Act and Rule 10b-5 is dismissed. Because New York common law fraud claims are analyzed nearly identically to fraud claims under the Exchange Act, the common law fraud claims alleged in the Second Count are also dismissed. *See Alpha Capital Ansalt*, 2018 WL 1627266, at *21–22.

## IV.    NEGLIGENT MISREPRESENTATION

Under New York law, a claim for negligent misrepresentation must show "(1) the existence of a special or privity-like relationship imposing a duty on the defendant to impart correct information to the plaintiff; (2) that the information was incorrect; and (3) reasonable reliance on the information." *J.A.O. Acquisition Corp. v. Stavitsky*, 863 N.E.2d 585, 587 (N.Y. 2007).

"A special relationship may be established by 'persons who possess unique or specialized expertise, or who are in a special position of confidence and trust with the injured party such that reliance on the negligent misrepresentation is justified.'" *Mandarin Trading Ltd. v. Wildenstein*, 944 N.E.2d 1104, 1109 (N.Y. 2011) (quotations and citation removed)). Factors bearing on this inquiry include "whether the person making the representation held or appeared to hold unique or special expertise; whether a special relationship of trust or confidence existed between the parties; and whether the speaker was aware of the use to which the information would be put and supplied it for that purpose." *Kimmell v. Schaefer*, 675 N.E.2d 450, 454 (N.Y. 1996). A lawyer or other professional may owe a duty to a party not in privity with him if there is "(1) an awareness by the maker of the statement that it is to be used for a particular purpose; (2) reliance by a known party on the statement in furtherance of that purpose; and (3) some conduct by the maker of the statement linking it to the relying party and evincing its understanding of that reliance." *Prudential Ins. Co. of Am. v. Dewey, Ballantine, Bushby, Palmer & Wood*, 605 N.E.2d 318, 321–22 (N.Y. 1992).

The trusts have failed to demonstrate that either Scibetta or Richter at any time owed them a duty of care. "[T]he only cases . . . holding that an attorney had, or was properly alleged to have had, a relationship approaching privity with a third-party are those in which the attorney issued an 'opinion letter' to his client in connection with a transaction for the purpose of reliance by the third-party on its contents." *Am. Med. Distributors v. Macdonald Tuskey*, No. 16 Civ. 6016 (VSB), 2018 WL 1478301, at *4 (S.D.N.Y. Mar. 23, 2018) (quoting *Doehla v. Wathne Ltd.*, No. 98 Civ. 6087 CSH, 1999 WL 566311, at *20 (S.D.N.Y. Aug. 3, 1999), in turn citing *Prudential Ins. Co. of Am. v. Dewey, Ballantine, Bushby, Palmer & Wood*, 80 N.Y.2d 377, 385 (1992)). None of the statements made by either of the attorneys — which were made in the context of promoting Willow Creek — approach the formality or purpose of an opinion letter; they can not give rise to liability under a theory based on negligence.

The Appellate Division opinion cited by the trusts in opposition, rather than supporting their argument, illustrates the difference between the type of communication that does expose an attorney to a negligent misrepresentation claim case and the case here. *See Chanin v. Machcinski*, 31 N.Y.S.3d 492, 493 (N.Y. App. Div. 2016). There, the plaintiffs requested an opinion letter from the defendants, a hedge fund's outside counsel, regarding the implications of SEC investigations into the fund. Although the attorneys characterized the investigation as a routine inquiry in response to new legislation, they were, in fact, mistaken. As a result of the attorneys' negligence, the plaintiffs' lost their investment. Here, the trusts never made the formal request for an opinion letter from either Scibetta or Richter that could give rise to the privity-like relationship necessary to sustain liability.

The only communication that approaches similarity with an opinion letter is Richter's allegedly false characterization of SEC rules in July 2016 as preventing the trusts from immediately redeeming their funds and Richter's statement that only members of the Genovese family could join the board in early 2017. But, as discussed in

19

*supra* part III.C, Richter's statements could not have caused any damages since, according to the Amended Complaint, there was no money in Willow Creek for the trusts to redeem.

Accordingly, the Fifth Count is dismissed as to all moving defendants.

## V.     NEGLIGENCE

For negligence, New York law requires the "plaintiff [to] demonstrate (1) a duty owed by the defendant to the plaintiff, (2) a breach thereof, and (3) injury proximately resulting therefrom." *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 286 (2d Cir. 2006) (quoting *Solomon ex rel. Solomon v. City of New York*, 66 N.Y.2d 1026, 1027 (1985)). "In terms of attorney malpractice [i.e., professional negligence], absent privity, [a] plaintiff must set forth a claim of 'fraud, collusion, malicious acts or other special circumstances' in order to maintain a cause of action." *AG Capital Funding Partners, L.P. v. State St. Bank and Tr. Co.*, 842 N.E.2d 471, 478 (N.Y. 2005).

The trusts attempt to fit themselves into this privity exception by referring to their claims of fraud. As discussed in *supra* part III and *infra* parts VI and VII, neither Scibetta nor Richter is sufficiently alleged to have committed fraud or aided and abetted Genovese's fraud at any point in the relevant time period. The trusts therefore cannot use the allegations of this conduct to fit within the "special circumstances" exception to the privity requirement. And, in any event, each of these claims of negligence suffer from the same flaw as the fraud claims: there is no allegation of damages that resulted from the allegedly negligent activity.

Accordingly, the Sixth Count is dismissed as to all moving defendants.

## VI.     CIVIL CONSPIRACY

"To state a claim for civil conspiracy under New York law, a plaintiff, in addition to alleging an underlying tort, must plead facts sufficient to support an inference of the following elements: '(1) an agreement between two or more parties; (2) an overt act in furtherance of the agreement; (3) the parties' intentional participation in the furtherance

of a plan or purpose; and (4) resulting damage or injury.'" *Bigio v. Coca-Cola Co.*, 675 F.3d 163, 176 (2d Cir. 2012).

No moving defendant argues that the trusts have failed to allege fraud and other torts on the part of Genovese. But the trusts have not plausibly alleged an agreement among any of the defendants, only conclusorily stating in their Amended Complaint that there was an agreement, "on information and belief." FAC ¶ 165.

Their arguments that an agreement can be plausibly inferred are unavailing. There are no alleged facts that indicate that Genovese ever agreed with anyone to perpetrate the fraud against the trusts. In the case of Scibetta, the trusts argue that the "kickbacks" he was to receive if the trusts made and retained their investments in Willow Creek are allegations sufficient to support an inference of a conspiracy between Scibetta and Genovese. But, as alleged, Scibetta's agreements were with a third party, not Genovese, and there is no indication that the third party ever agreed to anything with Genovese. *See* FAC ¶ 77. And in the case of Richter, the trusts did not sufficiently allege that she knew the fraud existed at all, as discussed in *infra* art VII.

Accordingly, the Fourth Count is dismissed as to all moving defendants.

## VII. AIDING AND ABETTING GENOVESE'S FRAUD

In New York, "[t]o establish liability for aiding and abetting fraud, the plaintiffs must show (1) the existence of a fraud; (2) [the] defendant's knowledge of the fraud; and (3) that the defendant provided substantial assistance to advance the fraud's commission." *Krys v. Pigott*, 749 F.3d 117, 127 (2d Cir. 2014) (internal quotations and citation removed). "[A]ctual knowledge is required to impose liability on an aider and abettor under New York law." *Id.* (internal quotations and citation removed). "Substantial assistance exists where (1) a defendant affirmatively assists, helps conceal, or by virtue of failing act when required to do so enables the fraud to proceed, and (2) the actions of the aider/abettor proximately caused the harm on which the primary liability is predicated." *Berman v. Morgan Keegan & Co., Inc.*, 455 F. App'x 92, 96 (2d Cir. 2012) (internal

quotations and citation removed); *see also SPV Osus Ltd. v. UBS AG*, 882 F.3d 333, 345 (2d Cir. 2018) (same).

The moving defendants do not dispute that Genovese committed fraud. But the plaintiffs have failed to allege that the conduct of either Scibetta or Richter rose to the level of aiding and abetting that fraud.

*First*, the trusts have not properly alleged that Scibetta had knowledge of Genovese's fraud. In New York, a complaint adequately alleges knowledge when it pleads "actual knowledge of the fraud as discerned from the surrounding circumstances." *Krys*, 749 F.3d at 127. According to the Amended Complaint, Scibetta assisted in the preparation of the Willow Creek brochure, which included false representations of Willow Creek's past performance — representations that Scibetta allegedly knew were false — and Scibetta assisted in the preparation of the Privacy Information document, which falsely stated that Willow Creek was a member of the SIPC — a statement Scibetta knew or should have known was false. But the bare allegations that Scibetta knew those representations were false are conclusory, and therefore not sufficient to support an inference of actual knowledge. *Cf. Steed Finance LDC v. Laser Advisers, Inc.*, 258 F. Supp. 2d 272, 282 (S.D.N.Y. 2003) (finding no actual knowledge when plaintiffs alleged that defendants had ignored "obvious warning signs). Without more allegations concerning how Scibetta knew that the financial results were fraudulent, he and his firm at the time, Bender, cannot be held liable for aiding and abetting Genovese's fraud.

*Second*, the meetings involving Scibetta make a stronger, but still deficient, case for inferring Scibetta's actual knowledge of Genovese's fraud. The trusts allege that Scibetta had received a list of investors and the amount they invested prior to the February 2016 meetings, during which he said the trusts were some of the smaller investors in Willow Creek. But the trusts do not allege that the list Scibetta received showed the *true* list of investors, thereby creating an inference that Scibetta had actual knowledge of Genovese's fraud. Attempts to argue that these allegations show conscious

avoidance of the truth or reckless disregard are unavailing; the Second Circuit has been quite clear that *actual* knowledge of fraud is required for an aiding and abetting claim. *See Krys*, 749 F.3d at 127.

And, in any event, there are no allegations that any assistance Scibetta rendered to Genovese was a proximate cause of the harm suffered by the trusts. *See Berman*, 455 F. App'x at 96. As discussed at length above, according to the Amended Complaint, the trusts' money had disappeared soon after they invested it. Nothing Scibetta did — as alleged — could therefore have caused further harm.

*Third*, the trusts entirely fail to allege Richter's actual knowledge of Genovese's fraud. They allege that she falsely advised them of relevant SEC rules and falsely reported to a third party the requirements for being on Willow Creek's board. But, they do not allege how she knew her representations were false, and most critically, they do not allege that she had actual knowledge of Genovese's fraud. This stands in stark contrast to the less-deficient allegations against Scibetta, who is alleged to have knowledge of the falsity of Genovese's statements as Genovese executed his fraudulent scheme. Of course, even if she were to have had the requisite knowledge, any assistance she had rendered would not have been a proximate cause of the trusts' injuries for the same reasons as discussed above regarding the meetings involving Scibetta.

Accordingly, the Third Count is dismissed as to all moving defendants.

## VIII.  CONCLUSION

For the foregoing reasons, the defendants' motions are GRANTED. All Counts are DISMISSED as to Scibetta, Richter, Bender, and Lee Anav. The trusts are granted leave to file a Second Amended Complaint by March 4, 2020. Any answer to a complaint

or objection to a Second Amended Complaint is due by April 1, 2020. The Clerk of Court is respectfully directed to terminate the motions, Docs. 46, 49, 52.

It is SO ORDERED.

Dated:   February 5, 2020
         New York, New York

_____
EDGARDO RAMOS, U.S.D.J.